IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

ARLENE ADELSHEIMER, Individually and as
Personal Representative on Behalf of the
Wrongful Death Beneficiaries of
PHILIP E. ADELSHEIMER, Deceased                          PLAINTIFF

V.                                          CIVIL ACTION NO. 4:22cv055-MPM-JMV

CARROLL COUNTY, MISSISSIPPI;
SHERIFF CLINT WALKER, Individually and in his
Official Capacity; WARDEN BRANDON M. SMITH,
Individually and in his Official Capacity;
AND JOHN and JANE DOES 1-100                             DEFENDANTS

## COMPLAINT

### *Jury Trial Demanded*

1. This Complaint is brought by Arlene Adelsheimer (hereinafter, "Plaintiff), Individually and as Personal Representative on Behalf of the Wrongful Death Beneficiaries of Philip E. Adelsheimer, Deceased, by and through the undersigned counsel, against Carroll County, Mississippi, Sheriff Clint Walker, Individually and in his Official Capacity; Warden Brandon Smith, Individually and in his Official Capacity; and John and Jane Does 1-100. In support therefore, Plaintiff states as follows:

### JURISDICTION AND VENUE

2. This cause of action arises under the United States Constitution, as well as the Civil Rights Act, 42 U.S.C. § 1983. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, § 1332, and § 1343.

3. Venue is appropriate pursuant to 28 U.S.C. § 1391(b) because the events complained of occurred in this judicial district and division.

1

## PARTIES

4. Plaintiff Arlene Adelsheimer is the mother of Philip E. Adelsheimer, deceased. Philip died on June 18, 2020, while he was an inmate at Carroll Montgomery County/Regional Correctional Facility (hereinafter "CMCRCF") located at 33714 MS Highway 35, Vaiden, Carroll County, Mississippi 39176. Plaintiff is an adult resident of Marietta, Georgia and brings this action individually on behalf of the surviving heirs/wrongful death beneficiaries of decedent.

5. Defendant Carroll County is located in the Northern District of the United States District Court, Greenville Division. Carroll County, by and through the Carroll County Sheriff's Department, manages and operates Carroll-Montgomery County/Regional Correctional Facility. CMCRCF is a regional correctional facility created by statute and its duly elected sheriff, Clint Walker, have the responsibility for providing humane care and treatment consistent with all constitutional and American Correctional Association (ACA) standards.

6. Defendant Carroll County is a Mississippi municipality and may be served with process of this Court by serving a copy of the Summons and Complaint upon the Chancery Clerk, Casey Carpenter, located at 600 Lexington Street, #B, Carrollton, Mississippi 38917.

7. Defendant Sheriff Clint Walker is the duly elected Sheriff of Carroll County, Mississippi. Sheriff Walker is the policy maker for Carroll County which also includes CMCRCF. Sheriff Walker knew about numerous problems including the prevalence of gangs at the prison and the inability to protect inmates from harm. Sheriff Walker knew about the threats against Philip E. Adelsheimer from gangs and his request for protection and deliberately ignored his requests. Sheriff Walker also knew that Philip E. Adelsheimer was a danger to himself and that he should have been placed on suicide watch. Sheriff Walker also knew that CMCRCF was dangerously understaffed with untrained jailers, and it was therefore foreseeable that this would create a

dangerous environment for the decedent, Philip E. Adelsheimer. Accordingly, Sheriff Walker is being sued in his official and individual capacity. Sheriff Walker may be served with process at his place of employment or residence.

8. Defendant Warden Brandon M. Smith is the warden at CMCRCF. Defendant Smith knew about numerous problems including the prevalence of gangs at the prison and the inability to protect inmates from harm. Defendant Smith knew about the threats against Philip E. Adelsheimer from gangs and his request for protection and deliberately ignored his requests. Defendant Smith also knew that Philip E. Adelsheimer was a danger to himself and that he should have been placed on suicide watch. Defendant Smith also knew that CMCRCF was dangerously understaffed with untrained jailers, and it was therefore foreseeable that this would create a dangerous environment for the decedent, Philip E. Adelsheimer. Accordingly, Defendant Smith is being sued in his official and individual capacity. Defendant Smith may be served with process at his place of employment or residence.

9. Plaintiff is ignorant as to the identities of Defendant John and Jane Does 1-100 who are unknown officers, employees, agents, and or servants of Carroll County, Mississippi. Plaintiff will amend this Complaint to allege their true names and allege that each of the fictitiously named Doe Defendants are responsible in some manner for the occurrences herein alleged, and the Decedent's damages, as alleged herein, were proximately caused by their conduct. Plaintiff, upon information and belief, asserts that the Doe Defendants were the officers, agents, servants, and employees of the Defendant, and were at all times acting under color of law with the permission and consent of Defendant within the course and scope of their employment.

**FACTS**

10. On June 18, 2020, Philip E. Adlesheeimer, was found dead in this cell at CMCRCF. Attempts to resuscitate him by staff and EMS were unsuccessful.

11. Philip had been in the same cell at CMCRCF for approximately (94) ninety-four days.

12. The medical examiner report lists the cause of death as ligature strangulation due to the consequence of hanging. The manner of death is listed as a suicide.

13. Plaintiff was given conflicting statements about her son's death. Plaintiff was initially told that Philip tragically took his own life by hanging himself with a bed sheet, from an air vent. She was also told that prison officials could not enter the cell because Phillip had tied the door to the front of the bed with a sheet. She was later told that Phillip hung himself from the bed and that a sheet from was tied from the bed to another shelf across the room.

14. As of November 2019, prior to decedent's death, the Mississippi prison system, known as the Mississippi Department of Correction (hereinafter "MDOC") incarcerates approximately 19,091 people in three (3) state run facilities; three (3) privately run correctional facilities and fifteen (15) regional correctional facilities.

15. Defendants knew or should have known that in the months before Philip's death, gang violence reached an all-time high in Mississippi state prison system.

16. Defendants knew or should have known that Mississippi state prisons are surrounded with gang violence and contraband.

17. Defendants also knew or should have known that the Mississippi prison system is in a state of acute and undeniable crisis.

18. Defendants knew or should have known between 2019 and early April 2020, more than 30 Mississippi prisoners died due to gang violence, suicide, or illness- over 10 times the average 3.4 prisoner deaths per year between 2014 and 2018.

19. Defendants knew or should have known that gangs are a fact of life in Mississippi prisons.

20. Defendants knew or should have known that the gangs are violent and control every aspect of prison life, from where the inmates sleep, if they eat, shower, or how often they make phone calls, charging a fee to use. These debts are paid with money, food, tasks such as carrying contraband for the gang, or even online currency like Green Dots.

21. Defendants knew or should have known that most of the Mississippi prison population, is gang affiliated. Those inmates, like Philip E. Adlesheeimer, who are not affiliated become victims.

22. Defendants knew or should have known that even when victims to gang violence are transferred to other prisons within MDOC, the threats against them and their family members continues. The gangs use cellphones – illegal contraband- to spread the word about victims to continue threatening, harassing, and in some cases assault them.

23. On or about, April 2018, Philip was incarcerated at Alcorn Regional Correctional Facility (herein after "ARCF"). Philip worked as a cook in the kitchen at ARCF until a high-ranking Vice Lord wanted his job for another gang member. The high-ranking Vice Lord threaten to cut Philip's throat with a prison knife – a can lid- if he came back to the kitchen. Philip reported the threat and requested segregation. Although Philip stopped working in the kitchen, the threats continued because he "snitched" and reported the threats on his life made by the high-ranking Vice Lord. Other inmates warned Philip to transfer facilities, but not to transfer to the Mississippi State

Penitentiary (herein after "Parchman") because the Vice Lords would be waiting on his arrival and would kill him.

24.     Despite his objections, on or about May 4, 2018, Philip was ultimately transferred to "Parchman".

25.     Less than four days after Philip was transferred from ARCF, he was assaulted by the Vice Lord gang members at Parchman. After the assault, the Vice Lords would not allow Philip to get in the bed or move away from the phone. Philip was afraid of being assaulted again or even worst killed so he told his mother, Plaintiff, about the continuing threats on his life.

26.     Plaintiff was afraid for her son's safety, so she contacted the MDOC Criminal Investigation Division (hereinafter "CID"). On or about May 31, 2018, Philip was transferred from "Parchman" Unit 29 to CMCRCF due to an assault and continued threats on his life by the Vice Lords gang. On the day of the transfer, shortly after Philip left unit 29 in Parchman, the K-9 unit was sent to raid Unit 29. During the raid, two high ranking gang members illegal cellphones were confiscated. The High-ranking Vice Lords blamed Philip because members of the K-9 unit told them that the raid was a result of Plaintiff's call to CID.

27.     While incarcerated at CMCRCF, Philip was constantly subjected to harassment and threats to kill him and his family by the Vice Lord gang. Plaintiff and Philip repeatedly informed officers and officials that he was threatened and feared for his safety. His multiple requests for protection and to be separated from gang members were deliberately ignored.

28.     Defendants continued to house nonviolent offenders, such as the decedent, with violent offenders that are serving life sentences.

29. Additionally, prison officials at CMCRCF gave gang members a copy of his complaints against them. These prison officials at CMCRCF also told other inmates that Philip was a "snitch".

30. As to be expected, the severity of the threats increased, because of the John and Jane Doe Defendants' actions and omissions and Philip grew more afraid for his life. The High-ranking members of the Vice Lords put a contract on his Philip's life for $25,000 for allegedly "snitching". Philip told Plaintiff that the gangs were going to kill him and make his death look like a suicide.

31. Plaintiff and Philip continued to request protective custody due to what he perceived to be repetitive threats of physical harm to him made by other inmates but unfortunately to no avail.

32. Philip was eventually told that he would be placed in protective custody at Parchman. The facility where he was assaulted by the Vice Lords and where they had placed a contract on his head. Afraid for his life, Philip opposed the transfer.

33. Again, despite his objections, he was told that he would be transferred back to Parchman once transfers resumed due to Covid-19.

34. Philip agonized and worried about his transfer back to Parchman and he repeatedly expressed his concerns to Defendants.

35. Philip exhibited signs, tendencies, and other outwardly signals that he was severely depressed and was desperate not to go back to Parchman and allow the gangs to kill him. This severe depression, anxiety, and desperation should have placed Defendants on notice that Philip was a danger to himself.

36. Defendants and prison staff at CMCRCF believed that Philip was paranoid and mentally unstable. Yet, Defendants and prison staff made no efforts for him to receive mental health treatment.

37. Due to Defendants' mental instability and fear for his safety, Defendants should have placed Philip on suicide watch and/or protective custody.

38. The cell chosen for Philip by the Defendants was not subject to the most efficient monitoring, and other cells were available for Philip where he could have been monitored much more closely as the circumstances dictated.

39. Prison officials at CMCRCF failed to keep the decedent Philip E. Adelsheimer safe from harm from other inmates and/or himself.

40. Despite Plaintiff and Philip's persistent attempts to gain the attention of Defendants and other prison officials at CMCRCF over the course of the three months immediately prior to his death, no action was undertaken by Defendants or other prison officials to ensure his safety- whether the threat of harm to him was, in fact from other inmates, or merely himself.

41. Philip's death is a highly predictable consequence of the Defendants' failure to protect him from harm.

**COUNT 1:**

**§ 1983 CAUSES OF ACTION:**
**EIGHTH AND FOURTEENTH AMENDMENT VIOLATIONS:**
**PROTECTION FROM HARM AND DANGEROUS CONDITIONS OF**
**CONFINEMENT**

42. Plaintiff incorporates all allegations set forth in Paragraph 1 through 41. Carroll County, acting by and through its elected and appointed officials, and Sheriff Clint Walker acted with deliberate indifference in the allegations listed above.

43. Defendant Carroll County, through Sheriff Clint Mason and John and Jane Doe Defendants 1- 100 in their individual and official capacities, established customs, policies and procedures which directly and proximately caused the deprivation of the deceased constitutional rights as alleged herein. Defendants were deliberately indifferent to the safety of Philip E. Adelsheimer and other inmates housed at CMCRCF. As a result of these policies, the Defendants failed to protect Phillip and created unconstitutional conditions of confinement.

44. Such unwritten policies, customs and practices include, but are not limited to the following:

   a. Inadequate and improper training, supervision and discipline of corrections officers;

   b. Inadequate and improper procedures and practices in screening, hiring, training, supervising, and disciplining officers who practice, condone or use excessive force of upon inmates, including the deceased, in violation of their constitutional rights;

   c. Inadequate and improper procedures, policies and practice for investigating improper activities by officers either through offender complaints of misconduct or through internally initiated complaints or investigations.

   d. Inadequate or improper procedures, policies and practices for identifying and taking appropriate action against officers who are in need of retraining, corrective measure, reassignment, or other non-disciplinary actions, through a positive or early warning system designed to prevent the violation of inmates' rights.

   e. Inadequate or improper procedures, policies and practices for identifying inmates requiring special attention and/or medical treatment due to the display of suicidal tendencies;

   f. Inadequate or improper procedures, policies and practices to provide for the safety, safekeeping, and well being of inmates displaying suicidal tendencies;

   g. Inadequate or improper procedures, policies and practices for adequately accessing and communicating an individual's suicide risk at all levels;

   h. Officers condoning and allowing inmates to fight;

     i. Failure to protect inmates from harm;

     j. Failure to prevent incidents of violence about which, Carroll County employees had warning;

     k. Failure to properly classify inmates;

     l. Failure to have protective custody;

     m. Failure to address the smuggling of contraband into the facility, and the chronic understanding at the jail in hiring jailers, with little to no training or supervision;

     n. Failure to conduct shakedowns to recover contraband;

     o. Failure to conduct safety checks in housing units or having officers assigned to housing units;

     p. Failure to provide inmates with reasonable, adequate, and timely medical care; and

     q. Failure to staff prison with adequate medical staff including but not limited to psychiatrists.

45. By exhibiting deliberate indifference to the substantial risk of harm Philip faced as a result of Carroll County's policies and procedures set forth above, which resulted in his tragic death, and generally failing to protect Philip from harm, the Defendants violated Philip's right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

## COUNT 2:

## EPISODIC ACTS OR OMISSIONS

46. Plaintiff incorporates all allegations set forth in Paragraphs 1 through 45.

47. As demonstrated above, Defendants maintained and operated CMCRCF in such a manner as to cause the pervasive deprivation of inmates' constitutional rights in every respect and on every level. Philip was forced to leave at CMCRCF and endure the action and inactions of its officials, as well as the correctional officers and correctional staff acting in accordance with prison

10

policies, customs and practices, under color of law, exhibiting callous and deliberate indifference, and depriving him of his rights guaranteed under the Constitution and the laws of the United States.

48. The Defendants and their employees had subjective knowledge of the substantial and serious threat that the decedent might commit suicide, or that other inmate(s) may cause harm to the Defendants. Yet the Defendants, nonetheless, disregarded the risk of suicide or harm by other inmates by responding to it with deliberate indifference. The Defendants and their employees clearly breached this duty and as a result, the decedent died while incarcerated at CMCRCF.

49. Defendants and correctional staff acting pursuant to prison policy, practice, and customs, created and required inmates to live in a prison that was deficient in so many respects that that it was not suitable for human confinement. These actions resulted in the infliction of punishment on each inmate who were forced to live there, including Philip.

50. Defendants adopted, implemented and permitted many other practices and customs that deprive most, if not all, inmates, including Phillip of their right to be protected from harm. These included policies, customs and practices, whether written or unwritten, that were expressly announced, sanctioned and or implemented by Sheriff Walker as final policymaker of CMCRCF. They also include policies, practices and customs, which, though possibly not formally adopted, had become so widespread, well so and deeply embedded in their application, use employment and acceptance in the prison to have become the policies of these Defendants.

51. The policies, practices and customs set forth in the preceding paragraph, as well as others which may come to light in the course of this litigation, resulted in numerous, repeated, pervasive and persistent deprivations of inmates' rights to be protected from harm under both the 8th and 14th Amendment at CMCRCF. Phillip's death was proximately caused by the Defendants' unconstitutional policies, practices and customs.

52. Correctional officers and prison staff, including the Doe Defendants, acted or failed to act, in accordance with the official policies, customs and practice of Sheriff Walker and Carroll County, or at the direction of and with the approval of these officials, in depriving Phillip of his rights, as described herein. The policies, practices and customs were moving forces in the action and inaction for correctional officers, and prison staff, and these correctional officers and prison staff acted with deliberate indifference to the right, welfare and medical needs of and other constitutional rights of Phillip.

53. As a direct and foreseeable result of Defendants' actions, Plaintiff and the wrongful death beneficiaries have suffered damage including, but not limited to, emotion distress, mental anguish, as well as pain and suffering.

## COUNT 3:

## RATIFICATION

54. Plaintiff incorporates all allegations set forth in Paragraphs 1 through 53.

55. Carroll County, its policymakers, specifically Sheriff Walker and Warden Smith, and the John and Jane Doe Defendants 1-100 were advised about the threats against Philip and his fear for his safety. Carroll County, by and through its policy makers, specifically Sheriff Walker and Warden Smith, ignored evidence of widespread disregard of policies and procedures intended for the protection of inmates including Philip, and systemic deficiencies that violated Philip's constitutional rights. Based on information and belief, not one officer, supervisor, or any other person was disciplined, considered for discipline, or even retrained on policies intended for the protection of inmates. Instead, the policy makers approved the actions of the correctional officers.

56. Through these acts and omissions of ratification, Carroll County's policymakers were deliberately indifferent to Philip's constitutional rights as set forth herein. A plaintiff can

establish a municipal liability claim by showing that a final municipal policymaker approved an investigation that was "so inadequate as to constitute a ratification" of the misconduct. *Wright v. City of Canton,* 138 F.Supp.2d 955, 966 (N.D. Ohio 2001). "If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). An isolated decision by a municipal official that is not intended to control future decisions can nonetheless give rise to municipal liability. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986). Carroll County ratified the actions of its employees; and is therefore, liable for Philip's death.

## COUNT 4:

## PUNITIVE DAMAGES

57.   The Plaintiff incorporates all allegations set forth in Paragraphs 1 through 56 hereinabove.

58.   Sheriff Walker and Warden Smith acted in complete disregard for the safety of Philip by acting in a manner as previously described herein. Defendants Walker and Smith's actions, in their individual capacities, warrant punitive damages to deter similar conduct in the future.

## PRAYER FOR RELIEF

59.   Plaintiff Arlene Adelsheimer, individually and on behalf of the wrongful death beneficiaries of Philip Adelsheimer, deceased, respectfully prays for the following relief:

    a. Actual and general compensatory damages of, from and against the Defendants, in amount to be determined by this Court;

    b. Punitive damages of, from and against the Defendant Sheriff Walker and Warden Smith, in their individual capacities, in an amount to be determined by this Court.

    c. Payment of the Decedent's funeral expenses;

    d. Reasonable attorney's fees and all costs of this Court;

    e. Pre and post judgement interest; and

    f. Such other general and specific relief as appears reasonable and just in this cause.

RESPECTFULLY SUBMITTED, THIS 8th day of April 2022.

                        ARLENE ADELSHEIMER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE ON BEHALF OF THE WRONGFUL DEATH BENEFICIARIES OF PHILIP E. ADELSHEIMER, DECEASED,

                        By: /s/ LaToya T. Jeter
                            LATOYA T. JETER
                            *Attorney for Plaintiff*

OF COUNSEL:

LaToya T. Jeter (MSB. NO. 102213)
Katrina S. Brown (MSB. NO. 102110)
BROWN BASS & JETER, PLLC
Post Office Box 22969
Jackson, Mississippi 39225
Telephone: (601) 487-8448
Facsimile: (601) 510-9934
Email: jeter@bbjlawyers.com
Email: brown@bbjlawyers.com