IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

ARLENE ADELSHEIMER, Individually and as
Personal Representative on Behalf of the
Wrongful Death Beneficiaries of
PHILIP E. ADELSHEIMER, Deceased                                    PLAINTIFF

V.                                    CIVIL ACTION NO. 4:22-cv-00055-MPM-JMV
CARROLL COUNTY, MISSISSIPPI;
SHERIFF CLINT WALKER, Individually and in his
Official Capacity; WARDEN BRANDON M. SMITH,
Individually and in his Official Capacity;
AND JOHN AND JANE DOES 1-100                                    DEFENDANTS

**ORDER**

This cause comes before the court on the motions of defendants Sheriff Clint Walker,

Warden Brandon Smith and Carroll County, Mississippi for summary judgment, pursuant to Fed.

R. Civ. P. 56. Plaintiff Arlene Adelsheimer has responded in opposition to the motions, and the

court, having considered the parties' submissions, is prepared to rule.

This is a 42 U.S.C. §1983 action seeking actual and punitive damages for defendants'

failure to protect plaintiff's decedent, Philip E. Adelsheimer, from hanging himself on June 18,

2020 while an inmate at the Carroll County Jail ("the Jail"). Adelsheimer, who was thirty years

old at the time, was discovered dead in his cell by jail officers at approximately 4:50 p.m., and all

attempts to revive him were unsuccessful. Prior to his suicide, Adelsheimer had repeatedly

expressed fear that he would be killed by other inmates, based upon their belief that he was a

"snitch." In their summary judgment brief, defendants argue that "[d]ue to Mr. Adelsheimer's

near-constant fears of harm from other inmates, he was secured in the segregation cell for

approximately ninety (90) days," [brief at 3] and they argue that this action on their part

demonstrated a concern for his safety and well-being. While acknowledging Adelsheimer's fear

1

of being attacked by other inmates, defendants insist that "[n]o one at the jail had any indication that Adelsheimer intended to harm himself or had any suicidal ideations." [Brief at 4].

Defendants' denial of any knowledge of Adelsheimer's suicide risk is significant, since it is well established that, in jail suicide cases, federal law requires prison officers to "ha[ve] gained actual knowledge of the substantial risk of suicide and responded with deliberate indifference." *Hare v. City of Corinth*, 74 F.3d 633, 650 (5th Cir. 1996) (en banc). To avoid liability, "[p]rison officials charged with deliberate indifference might show . . . that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Farmer*, 511 U.S. at 844. Mere evidence that the official was "aware of a substantial risk to inmate safety does not alone establish deliberate indifference." *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016). "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

The requirement that a plaintiff establish fact issues regarding whether a jail officer had *subjective* knowledge of an inmate's suicide risk is, in this court's experience, the one upon which most jail suicide cases fail. In their pre-discovery summary judgment motion, defendants argued that "plaintiff has no evidence that Defendants Clint Walker, Sheriff of Carroll County, Mississippi, or any other defendant knew or should have known that Philip Adelsheimer was a suicide risk." [Brief at 1]. In denying this motion, this court emphasized that, since discovery on this issue had not been conducted, it was unable to make an informed ruling regarding whether defendants had subjective knowledge of Adelsheimer's suicide risk or not. [Slip op. at 5-6]. The

2

parties have now conducted the discovery which this court ordered, and, consistent with their

prior arguments, defendants Walker and Smith have each submitted affidavits and/or deposition

testimony denying that they had any knowledge of the risk that Adelsheimer might want to kill

himself. Indeed, both defendants insist that they were only aware of Adelsheimer's stated fear

that he might be attacked by *other inmates*, and they argue that all reasonable steps were taken to

prevent this risk, including by placing him in a cell by himself.

      If plaintiff had failed to submit evidence casting doubt upon defendants' summary

judgment arguments, then this court would very likely grant their summary judgment motions in

full. As it happens, however, plaintiff has submitted an affidavit in which she contends that she

repeatedly expressed her concern that her son would either be harmed by fellow inmates or that

he would harm himself. Specifically, plaintiff alleges that:

> I managed to speak with both Warden Smith and Sheriff Clint Walker on separate
> occasions. In both conversations, I expressed my concerns that I was fearful that my son
> would harm himself or someone would harm him. I told them that Philip was extremely
> depressed, fearful, and worried about being transferred back to Parchman. I specifically
> asked the Warden if Philip was coming out of his isolated cell, but I didn't get a response.
> I told both the Warden and Sheriff, that while I did not want Philip to go back to the
> general population, I could tell that being in lockdown for such a long period of time was
> negatively affecting Philip's mental and physical health. I requested their assistance to
> get Philip transferred to protective custody but to no avail. I also requested that Philip get
> some mental health treatment. During both conversations, Warden Smith and Sheriff
> Walker each listened to my concerns and assured me that they would take care
> of the situation. . . . My son did not **willingly** commit suicide, he was forced to do so
> because Sheriff Walker, Warden Smith, Chief Smith, Captain Hamer and all the other
> staff at Carroll County deliberately disregarded his risk of serious harm to himself or by
> another inmate. As a result of the prison officials' refusal to help my son, he was hopeless
> and believed his only way to end this tragic situation was to take his own life. I told
> Sheriff Walker, Warden Smith, Chief Smith, Captain Hamer, and Devan Marlow that I
> was afraid that my son would harm himself while he was in lock down for approximately
> ninety-seven days (97) and no one listened to me. Instead, they did absolutely nothing!

[Affidavit at 5-6](emphasis in original).

In their reply brief, defendants argue that "Plaintiff's version of events is so utterly discredited by the record that no reasonable jury could believe her." [Reply brief at 3]. More specifically, they argue that:

> Plaintiff's affidavit and her complaint are the only evidence cited in support of her allegation that any Defendant herein had subjective knowledge of a substantial risk of suicide and responded with deliberate indifference. Glaringly absent from Plaintiff's response is any reference to any professional psychologist or psychiatrist qualified in the field of suicide detection and prevention. Plaintiff must establish some question of fact as to foreknowledge or notice to Defendants of suicidal tendencies in Mr. Adelsheimer. *Sibley v. Lemaire,* 184 F.3d 481, 487 (5th Cir. 1999). All she can muster is a self-serving affidavit that contradicts her own written words of surprise and disbelief at her son's death by suicide.

[*Id.* at 6]. Defendants' last contention is in reference to a letter written by plaintiff to defendant Smith after her son's death, in which she stated "[t]he items returned to me only showed a gentle loving soul. sober, healthy, full of love for God and his family…I know in my heart he did not commit suicide." [Exhibit K].

If this court were serving as the trier of fact in this case, then it might well agree with defendants that plaintiff's affidavit is simply too self-serving and lacking in objective supporting evidence to serve as the sole basis for liability in this case. Defendants' problem is that this court is *not* serving as trier of fact in this case, and, on summary judgment, it is required to view the evidence in the light most favorable to the plaintiff, as the non-moving party. Additionally, this court finds that there are other circumstances in this case, apart from Arlene's warning, which supported a suspicion that Adelsheimer was a suicide risk. This court discusses these circumstances in detail below, and, in considering them, it must be cognizant of its previously-stated obligation to do so in the light most favorable to plaintiff. The U.S. Supreme Court has made it clear that this court is obligated to do so even in the qualified immunity context, writing in *Tolan v. Cotton*, 572 U.S. 650, 660, 134 S. Ct. 1861, 1868 (2014) that:

> In holding that Cotton's actions did not violate clearly established law, the Fifth Circuit failed to view the evidence at summary judgment in the light most favorable to Tolan with respect to the central facts of this case. By failing to credit evidence that contradicted some of its key factual conclusions, the court improperly "weigh[ed] the evidence" and resolved disputed issues in favor of the moving party.

*Tolan*, 572 U.S. at 657, 134 S.Ct. 1861.

Given this plaintiff-friendly summary judgment standard, this court is not in a position to simply proclaim that Arlene is lying in her affidavit. In so stating, this court emphasizes that, in cases where a defendant contends that a plaintiff is lying, the most helpful way of ascertaining whether or not this is the case is by having a jury consider her live testimony and assess its credibility. Indeed, assessing the credibility of witnesses is *the* key function which jurors perform at trial, and they are uniquely well-suited to perform it. This court does acknowledge that plaintiff's letter to Warden Smith after her son's death gives defendants a potentially helpful "talking point" before the jury and a potentially fruitful avenue upon which to cross-examine her. At the same time, having a child commit suicide is one of the most difficult events which any parent can endure, and a grieving mother's reluctance to accept the reality that her son actually did commit suicide strikes this court as being entirely understandable. This court notes that Arlene's letter was written on September 18, 2020, a few months after her son's suicide, while her affidavit was written in May 2023. In the court's view, this lengthy time differential gives plaintiff a potentially strong argument that her current acceptance that her son committed suicide is simply a reflection of a lengthy grieving process (of which initial denial is a well-established part), rather than evidence of a deliberate lie on her part.

In light of the foregoing, this court's order today will be based upon the required plaintiff-friendly view of the evidence, namely that Arlene was being truthful when she swore in her affidavit that she informed both Sheriff Walker and Warden Smith of her concern that her

5

son would commit suicide. Even considering the evidence in this light, however, this court emphasizes that neither side has submitted authority clearly establishing whether or not proof of such warnings from a concerned parent to a jail official are sufficient, in the absence of medical or other objective proof of a suicide risk, to establish liability. This court can discern reasonable arguments on both sides of this issue.

On the one hand, it can certainly be argued that a parent or other close family member knows an inmate better than any psychiatrist could and that their stated concerns that the inmate might kill himself should therefore be granted great weight by jail officials. This court emphasizes that, in cases of such warnings by family members, the actual life of the inmate is at stake, and, that being the case, it is certainly arguable that jail officials should err on the side of protecting that life. On the other hand, this court can discern a reasonable argument that it would be unreasonable to expect jail officials to take heroic actions to remove any possibility of inmate suicides based upon subjective fears expressed by a family members. In so stating, this court notes that prison officials are routinely confronted with inmates who find themselves at an absolute low point in their lives, and, considering their limited resources, it is arguably unrealistic to expect them to employ suicide prevention protocols based solely upon fears of suicide expressed by family members.

That brings this court to the fact that there are additional factual circumstances in this case, apart from Arlene's stated concerns for her son's safety, which might reasonably have led jail officials to conclude that Philip was a suicide risk. This court discusses these circumstances in greater detail below, but, briefly stated, defendants were well aware that Philip was in a state

of extreme fear and anxiety over the possibility that he would be murdered by fellow inmates,[1] and, that being the case, they arguably should have anticipated that these fears would lead to an increased suicide risk on his part.  In their reply brief, defendants insist that plaintiff is lying in her affidavit, but they offer this court no authority which clarifies whether, assuming her affidavit is true, notice by a family member, considered in the context of a clearly distressed and anxiety-ridden inmate, is sufficient to establish the required subjective knowledge on the part of jail officials that an inmate would kill himself.

Plaintiff likewise offers no authority clearly establishing liability in this context, and uncertainty in the law in this context ultimately serves as the basis for resolving the summary judgment motions in this case.  In so stating, this court emphasizes that plaintiff asserts two different types of claims, as to which different § 1983 standards apply.  First, plaintiff asserts claims against Sheriff Walker and Warden Smith in their individual capacities, and stringent qualified immunity standards apply as to these claims.  Second, plaintiff asserts claims against these same defendants in their official capacities, and it is well settled that such official capacity claims are properly regarded as claims against Carroll County itself.  As to the claims asserted against Sheriff Walker and Warden Smith in their individual capacities, each of these defendants has raised a qualified immunity defense against them.  To rebut a qualified immunity defense, the plaintiff must show: (1) that she has alleged a violation of a clearly established constitutional right, and (2) that the defendant's conduct was objectively unreasonable in light of clearly established law at the time of the incident. *Waltman v. Payne*, 535 F.3d 342, 346 (5th Cir. 2008).

---

[1] As noted previously, defendants concede in their summary judgment brief that Philip had "near-constant fears of harm from other inmates."  [Brief at 3].

7

It is well established that a defendant who "pleads qualified immunity and shows he is a governmental official whose position involves the exercise of discretion" thereby places the burden on the plaintiff to "rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law." *Pierce v. Smith*, 117 F.3d 866, 871-72 (5th Cir. 1997). The "clearly established" prong often proves to be fatal to § 1983 claims against municipal officials in their individual capacities. In *Plumhoff v. Rickard*, for example, the Supreme Court upheld a qualified immunity defense on the basis of the "clearly established" prong, emphasizing that:

> An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was " 'clearly established' " at the time of the challenged conduct. *Ashcroft v. al–Kidd*, 563 U.S. [731], 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011). And a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. *Id.*, at 2083–2084. In other words, "existing precedent must have placed the statutory or constitutional question" confronted by the official "beyond debate."

*Plumhoff*, 572 U.S. 765, 134 S.Ct. 2012, 188 L.Ed.2d 1056 (2014). Making plaintiffs' burden in this context even more difficult, the Supreme Court wrote in *City and County of San Francisco v. Sheehan*, 575 U.S. 600, 135 S.Ct. 1765, 1778, 191 L.Ed.2d 856 (2015) that, to establish that any supportive precedent was "clearly established," the plaintiff must be able to cite either a decision from that Court or a "robust consensus of cases of persuasive authority in the Courts of Appeals." It should thus be apparent that establishing a violation of "clearly established" federal appellate law is a tall order even for those plaintiffs who actually attempt to do so, and the plaintiff here has made no serious efforts in this regard.

In her brief, plaintiff offers this court nothing more than vague and generalized holdings of law in seeking to meet the "clearly established" prong. Specifically, plaintiff writes in her brief that:

The second part of the qualified immunity analysis determines whether the Defendants' conduct was objectively unreasonable in light of clearly established law at the time of Philip's suicide. Again, there is little doubt that the right to provide a prison inmate with basic human needs and protection from harm during confinement was clearly established at this incident occurred. *See Farmer v. Brennan*, 511 U.S. 825, 847 (U.S. 1994); *Hare v. City of Corinth*, 74, F.3d 633, 650 (5th Cir. 1996). Therefore, the "objective reasonableness" of the official is the focus of the inquiry in this case. In jail suicide cases, the official must have "subjective knowledge of a substantial risk of serious harm to the inmate but respond with deliberate indifference to that risk. Hare, 74 F.3d at 650; *Farmer*, 511 U.S. at 847. A prison official shows a deliberate inference to the risk by "failing to take reasonable measures to abate it." *Hare*, 74 F.3d at 648.

A prison official must be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must draw the inference. *Farmer*, 511 U.S. at 837. Whether a risk is substantial, and the threatened harm is serious represents an objective test; whether prison officials consciously disregard the risk represents a subjective one. *Ball v. LeBlance*, 792 F.3d 584, 592 (5th Cir. 2015). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the unusual ways, including inference from circumstantial evidence, and a factfinder my conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. *Id.*

In this case, it is undisputed that Philip was not placed on suicide watch. Both Defendant Warden Smith and Sheriff Walker agree that they took no action to place Phillip on suicide watch. The cases that judge the "objective reasonableness" of the Defendants' action in detail turn on whether Defendants did "enough" given the knowledge of suicidal tendencies. Defendants Warden Smith and Sheriff Walker argue that they did not have "subjective knowledge of a substantial risk of harm" to Philip.

[Brief at 15-16].

In offering these vague arguments and authorities, plaintiff runs afoul of the Supreme Court's admonition that "[w]e have repeatedly told courts ... not to define clearly established law at a high level of generality," since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced. *Plumhoff*, 134 S.Ct. at 2023. Once again, the U.S. Supreme Court has stressed that plaintiffs' burden of demonstrating that defendants violated "clearly established law" requires not a citation to generalized principles of law, but, rather, specific authority which "placed the statutory or constitutional question" confronted by the official "beyond debate." *Id.* This court can discern no serious argument that plaintiff's briefing in this case meets the stringent standard set forth in *Plumhoff* and similar

cases, and it accordingly concludes that she has failed to "clearly establish" whether Fifth Circuit law required a defendant to take steps to prevent suicides based upon circumstances similar to those here, and, if so, what steps it was required to take in this regard. *See Hyatt v. Thomas,* 843 F.3d 172, 177-78 (5th Cir. 2016)(noting the uncertainty in Fifth Circuit case law regarding what steps a jail official is required to take to prevent suicides). This court accordingly concludes that Sheriff Walker and Warden Smith's qualified immunity motions are due to be granted, as to the claims asserted against them in their individual capacities.

As to plaintiff's claims against the County, there is no requirement that the plaintiff establish that the law in this context was "clearly established" at the time of the defendants' actions, but the County is able to assert the robust defenses to municipal liability arising from the U.S. Supreme Court's decision in *Monell v. Department of Soc. Svcs.*, 436 U.S. 658 (1978). Under *Monell* and its progeny, a plaintiff must demonstrate the existence of a municipal "custom or policy" of committing a particular constitutional violation in order to establish § 1983 liability on the part of that municipality. While the *Monell* "custom or policy" requirement generally proves fatal to municipal claims based on the actions of low-level deputies and police officers, it is well established that "sheriffs in Mississippi are final policymakers with respect to all law enforcement decisions made within their counties." *Brooks v. George Cnty., Miss.,* 84 F.3d 157, 165 (5th Cir. 1996). The Fifth Circuit has held that Mississippi sheriffs are also the final policymakers for their counties with regard to incarcerations at the county jail, *see Jauch v. Choctaw Cnty.*, 874 F.3d 425, 435 (5th Cir. 2017), and this court accordingly concludes that plaintiff's evidence that she personally informed Sheriff Walker of her belief that her son was suicidal might be sufficient to establish fact issues regarding the County's liability in this case, if

10

there is evidence that he personally took actions in this case which ran afoul of relevant constitutional standards.

In this vein, this court wishes to make clear its view that, while the proof against Sheriff Walker is far from overwhelming, it is considerably stronger than defendants suggest in their briefing. In so stating, this court initially notes that, in his deposition, Walker conceded that "I do believe that I spoke to his mother several times" about her "worries about [her] child's safety." [Depo. at 9-10]. Once again, it is defendants' contention that plaintiff is lying in her affidavit when she contends that she told Sheriff Walker about her concerns that her son would kill himself, and, that being the case, it seems quite significant that he testified to his recollection that he had, in fact, spoken to her on several occasions about her concerns for her son's safety.

It strikes this court that, in many cases in which a parent might seek to fabricate allegations that she had spoken with jail officials about her concerns that her child would kill himself, the defendant would respond that he had never spoken with the plaintiff at all. This would place the burden upon the plaintiff to substantiate her allegations, such as through phone records or witnesses who saw her speaking with the defendant. In this case, however, Sheriff Walker admitted that he spoke with plaintiff several times about her concern for her son's safety, and the only disagreement is whether the concerns she expressed related solely to the possibility that other inmates would harm him or whether she was also concerned that he would harm himself. This court does not regard it as being, by any means, implausible that Arlene would have expressed both concerns in this case, since they seem entirely consistent with each other. In so stating, this court emphasizes its belief that constant and severe anxiety on the part of an inmate that he would be murdered by other inmates might well lead to a heightened risk that this same inmate would take his own life. Indeed, it is not at all inconceivable that a distressed and

11

anxiety-ridden inmate might conclude that it would be preferable to die at his own hands than to be brutally murdered by fellow inmates. Tragically, it appears that Philip Adelsheimer reached just that conclusion in this case, and a jury might well conclude that it was foreseeable to Walker that this would occur.

This court notes that, in his deposition, Sheriff Walker testified that, after he received the worried phone calls from Arlene, he "probably" spoke with jail officials about taking measures to protect Adelsheimer from other inmates. [Deposition at 13]. In his deposition, Walker repeatedly used such equivocal "probably" language regarding matters, which, a jury might conclude, he is likely to have a firm recollection one way or the other. These matters include having spoken with plaintiff about her concerns for her son's safety and having gotten personally involved in ensuring steps for his safety.[2] These are each matters which, assuming Walker's actions were legally insufficient, might give rise to liability on the part of the County in this case. It is accordingly possible that jurors will find a certain degree of evasiveness in Sheriff's Walker's testimony and conclude that he is being less than truthful in denying that Arlene spoke to him about her concerns that her son would kill himself. [Depo. at 18].

This court reiterates that it does not regard the above evidence against Sheriff Walker as being by any means overwhelming, but it does conclude that, considering the evidence in the light most favorable to plaintiff, she has a legitimate jury argument that the County should be held liable for Sheriff Walker's actions in this case.[3] This court accordingly concludes that there

---

[2] In the former case, after initially stating his recollection that he had spoken with plaintiff "several times," Walker equivocated somewhat about having spoken to her at all, stating that it was possible he was confusing her with some the parent of another inmate. [Depo. at 9].

[3] This court notes that, in her brief, plaintiff offers extensive arguments that the Jail failed to follow its own "offender segregation policy," including its requirement that a medical evaluation be provided. [Brief at 5]. While these arguments strike this court as being potentially

are genuine fact issues regarding the County's liability for Sheriff Walker's actions in this case, and its motion for summary judgment will therefore be denied.

In light of the foregoing, it is ordered that Sheriff Walker and Warden Smith's motions for summary judgment are granted as to the claims asserted against them in their individual capacities, and Carroll County's motion for summary judgment is denied as to the claims against it, based upon the actions of Sheriff Walker as its final policymaker regarding law enforcement matters.

SO ORDERED, this the 1st day of June, 2023.

/s/ Michael P. Mills
UNITED STATES DISTRICT COURT JUDGE

---

strong, it will not discuss them here, partly since it is unclear to what extent, if any, Sheriff Walker had a personal role in any failure to comply with jail policies.